T.C. Memo. 2005-150

UNITED STATES TAX COURT

THOMAS AND JULIA BO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10657-03.                    Filed June 23, 2005.

Thomas and Julia Bo, pro se.

<u>Michael D. Zima</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent issued a final determination disallowing petitioners' claim under section 6404(e) for abatement of interest related to their income tax liabilities for 1991-95 that accrued from March 18, 1999, to October 8, 2002.

Respondent concedes that petitioners are entitled to abatement of interest that accrued from June 26 to November 7,

2001. The issue for decision is whether respondent's denial of petitioners' remaining claim for abatement of interest relating to petitioners' 1991-95 tax years was an abuse of discretion. We hold that it was with respect to the time from July 3 to July 23, 2002.[1]

Section references are to the Internal Revenue Code as amended. Rule references are to the Tax Court Rules of Practice and Procedure. References to petitioner are to Thomas Bo.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Petitioners are married and lived in Malabar, Florida, when they filed the petition. They have four children.

Petitioner operated a business through which he sold, leased, and installed security, monitoring, and alarm systems. Petitioner wife did the office work for the business including compiling data needed to prepare petitioners' tax returns. At a

---

[1] Respondent filed a motion for summary judgment which we granted with respect to whether petitioners are entitled to relief under sec. 6404(e)(1)(A), which applies to any deficiency attributable to any ministerial delay by respondent. We did so because respondent determined no deficiencies with respect to the years in issue. We denied respondent's motion for summary judgment with respect to sec. 6404(e)(1)(B) and the flush language of sec. 6404(e)(1) as to whether petitioners' delay in paying their 1991-95 taxes was attributable to erroneous or dilatory performance of a ministerial act by an officer or employee of the Internal Revenue Service, and, if so, whether petitioners caused any significant aspect of the delay.

time not specified in the record, petitioner wife had serious medical conditions which prevented her from compiling that tax data.

Petitioner suffered substantial personal injuries in an automobile accident on December 13, 1996, which left him permanently 20 percent disabled. During the 4 years after the accident, petitioners struggled financially, were evicted from two homes, and had one vehicle repossessed.

B.   Petitioners' Federal Income Tax Returns and Payments

Petitioners requested and received an extension of time to October 15, 1992, to file their 1991 Federal income tax return. Petitioners submitted $1,000 with that request. They later reported a tax liability of $2,794 for 1991.

Petitioners did not request or receive extensions of time in which to file their Federal income tax returns for 1992-94. Petitioners requested and received an extension of time to October 15, 1996, to file their 1995 return. Petitioners submitted $435 with this request. They later reported a tax liability of $544 for 1995.

Petitioners untimely filed their 1991-95 Federal income tax returns on April 17, 1997. H & R Block prepared those returns. On those returns, petitioners reported the following income tax liabilities:

| Year | Tax |
|------|------|
| 1991 | $2,794 |
| 1992 | 1,144 |
| 1993 | 859 |
| 1994 | 1,527 |
| 1995 | 544 |
| Total | 6,868 |

Petitioners did not pay any tax with their returns for 1991-95.

Respondent assessed the tax which petitioners reported on their return for 1995 on May 19, 1997, for 1991 and 1994 on May 26, 1997, and for 1992 and 1993 on June 30, 1997. Respondent also assessed additions to tax for failure to timely file under section 6651(a)(1) and failure to pay the tax shown on the return under section 6651(a)(2) as follows:

| | Additions to tax | |
|------|------|------|
| Year | Sec. 6651(a)(1) | Sec. 6651(a)(2) |
| 1991 | $403.65 | $448.50 |
| 1992 | 257.40 | 286.00 |
| 1993 | 193.28 | 167.51 |
| 1994 | 343.58 | 198.51 |
| 1995 | 100.00 | 28.63 |
| Total | 1,297.91 | 1,129.15 |

On June 2, 1997, petitioners gave respondent a check in the amount of $584.36 to be applied to their balance due for 1996. The issuing bank did not honor this check.

C. Events Occurring From April 17, 1997, to March 18, 1999

Petitioners filed their returns for 1991-95 on April 17, 1997. Petitioner knew in 1997 and early in 1998 that petitioners had not paid the taxes they reported were due on those returns. He believed that petitioners had not correctly reported their tax

liabilities on their returns for the years in issue because he thought they had not deducted enough for telecommunication expenses (cell phones and pagers).

In 1997 and early 1998, petitioner told Annette Davis (Davis), an employee of respondent,[2] that he believed petitioners had reported owing more tax than they owed. Davis recommended that petitioners submit an offer in compromise.

D.   Events From March 18, 1999,[3] to October 8, 2001

1.   March 18, 1999

Petitioner mailed a letter to Davis on March 18, 1999, in which he referred to a conversation he had had with her. In that conversation, petitioner had told Davis that he believed that petitioners' returns were incorrect because they did not include deductions for telecommunication costs of about $5,000 per year.

On March 13, 2000, petitioner wrote to respondent and asked respondent to consider petitioners' situation as an economic hardship case. In that letter, petitioner said that his accident on December 13, 1996, had caused severe physical injuries to him and substantial financial losses to his business.

---

[2]   Annette Davis's position with respondent at that time is not in the record. She later became a group manager.

[3]   Petitioners contend that interest on their underpayment for 1991-95 that accrued from Mar. 18, 1999, to the present should be abated.

Petitioners submitted an offer in compromise to respondent in late April or early May 2000. Respondent returned it to petitioners on May 3, 2000, because petitioners had not filed a return for 1998. Petitioners resubmitted their offer in compromise on May 13, 2000, with their tax return for 1998. In the resubmitted offer in compromise, petitioners proposed to pay $2,500 to settle their 1991-95 tax liabilities.

On a date not stated in the record, petitioner called Davis to ask about the status of petitioners' case. He learned that Davis was on maternity leave and that Phyllis McLaughlin (McLaughlin) was responsible for petitioners' case. Petitioner spoke with McLaughlin many times.

One of respondent's employees (not identified in the record) told petitioner that respondent was returning petitioners' offer in compromise because petitioner had apparently included his business gross receipts in his personal income. The employee told petitioner to separate his personal and business items so that respondent's evaluators would not assume that petitioner's income included his business gross receipts. McLaughlin suggested to petitioners that they seek help from an accountant to separate those items. Petitioners retained John Holder (Holder).

R. Chambers (Chambers), a member of respondent's collection division in Melbourne, Florida, faxed to petitioners on July 27,

2000, a letter that Chambers had prepared for petitioners to sign. The letter stated (without explanation) that petitioners requested to withdraw their pending offer in compromise for 1991-95. Petitioner signed the letter and returned it to Chambers on July 27, 2000. Davis told petitioners that their offer in compromise to settle their liability for 1991-95 was considered withdrawn on July 28, 2000.

2.  Administrative Proceedings Under Section 6330(b)

Respondent filed a notice of Federal tax lien with respect to petitioners' 1991-95 Federal income tax liabilities 2 days after petitioners withdrew their offer in compromise. The lien adversely affected petitioner's credit, including his ability to buy alarm equipment on credit to install for his customers.

On August 2, 2000, petitioners timely filed a request for a collection due process hearing.

On dates not stated in the record: (a) Petitioner asked respondent's employees (not identified in the record) why respondent had filed a Federal tax lien; (b) petitioner was told that he had not resubmitted an offer in compromise; (c) petitioners submitted to respondent a offer in compromise that Holder had helped to prepare; (4) respondent did not accept it because petitioners had not filed all tax returns that were due; and (5) petitioners prepared returns that were due and submitted them with the offer in compromise.

On October 18, 2000, petitioners filed amended returns in response to respondent's assessment of petitioners' tax liabilities for 1991-95. Petitioners reported lower tax liabilities for 1991-95 in those amended returns than they had reported in their original returns for those years.

Respondent assigned petitioners' collection due process case to Appeals Officer Vivian Watson (Watson) on April 26, 2001. Watson attended job-related training from April 30 to May 11, 2001.

On May 22, 2001, Watson wrote to petitioners to schedule a collection due process hearing for June 7, 2001. Watson enclosed a Form 433-A, Collection Information Statement for Individuals, that she asked petitioners to complete and return to her by June 6, 2001. Petitioners completed the Form 433-A and returned it to Watson on June 6, 2001.

At petitioners' request, Watson conducted the collection due process hearing on June 6, 2001. Immediately after the hearing, Watson wrote a letter to petitioners in which she enclosed a Form 433-B, Collection Information Statement for Businesses, to be returned by June 20, 2001. Watson also asked for a copy of petitioners' original 1991-95 returns, spreadsheets used to prepare the amended 1991-95 returns, and telecommunication bills for expenses claimed on the amended 1991-95 returns. Petitioner

worked on the spreadsheets every night for 2 weeks, then submitted them to Watson.

Petitioner telephoned Watson on June 20, 2001, and told her that he had found canceled checks for the telecommunication expenses. Watson then agreed to withhold a decision on whether the filing of a lien was proper until respondent's examination division reviewed petitioners' telecommunication expense deductions for the years in issue. Watson incorrectly told petitioner on June 26, 2001, that petitioners' file would be sent to the examination division in Melbourne, Florida. Instead, it was sent to PSP, an internal address of respondent not further identified in the record.

On November 5, 2001, petitioner asked Watson to expedite consideration of petitioners' case because the lien was hurting his credit. Petitioner told Watson that he could not obtain a car loan while their case was pending. Watson told petitioner that petitioners' file was supposed to be in Melbourne and that she had been unable to find it. Petitioner brought records to Watson on November 7, 2001, but personnel in respondent's Melbourne examination division could not work on petitioners' case because they did not have petitioners' file. Watson began looking for petitioners' file on November 7, 2001. Watson learned that Arthur Washburn (Washburn), an employee of respondent in PSP, had signed a transmittal document for

petitioners' file.  Watson called Washburn, and he found petitioners' file on November 7, 2001.

Petitioner called Watson on November 7, 2001, to ask her to give him a statement that respondent was trying to resolve his case.

Washburn delivered the file to Watson on November 8, 2001. On that day, Watson called respondent's examination division and asked for an expedited audit of petitioners' returns when she received them.  Watson did not work on petitioners' case during unspecified dates between November 9, 2001, and January 17, 2002, because she was busy working on cases calendared for trial that month and because she took annual leave that she would otherwise have lost.  Watson received petitioners' original and amended returns from an employee of respondent on December 5, 2001.

Watson resumed working on petitioners' case on January 17, 2002.  On January 24, 2002, using some of the checks petitioner had provided, Watson showed him that the amounts that petitioners had reported on their original returns for telecommunications expenses were correct.  Petitioner agreed that Watson was correct.

Watson told petitioner that petitioners must pay taxes they owed to remove the lien.  On January 24, 2002, petitioner told Watson that petitioners wanted to file an offer in compromise because they did not have enough money to pay the tax and

interest.  Watson told petitioners that they needed to file returns for 2000 and 2001 that had not been filed.  Watson sent offer in compromise forms to petitioners, closed the case on January 24, 2002, and so informed petitioners.

Petitioners submitted an offer in compromise on May 24, 2002.  In it, petitioners did not check the box to indicate whether the offer was on account of doubt as to liability or as to collectibility and did not state an amount to settle their case.  Respondent returned the offer in compromise because petitioners had not filed their 2000 or 2001 return.

Petitioners submitted another offer in compromise on June 3, 2002, in which they offered to pay $850 to satisfy their liabilities for the years in issue.  They also submitted a Form 433-B for their business in which they separated petitioner's personal income and gross business receipts.  Petitioners did not check the box on the form to indicate whether the offer was on account of doubt as to liability or as to collectibility.

### 3.   The Taxpayer Advocate Service

On June 10, 2002, petitioners wrote to respondent's Taxpayer Advocate Service office in Jacksonville, Florida, and asked it to expedite the processing of their offer in compromise and to release the lien.  Petitioners wanted their offer in compromise to be considered by an office near their home.  On June 13, 2002, Diane Wilkes (Wilkes), an employee in respondent's Taxpayer

Advocate Service office, wrote to petitioners to tell them that she was working on their case and would contact them by June 28, 2002.

Around June 17, 2002, Wilkes asked petitioner to provide letters from his creditors stating that they would not sell products to him because of the tax lien. On June 18, 2002, Wilkes spoke to Watson, who said that petitioners' case had not been released from Appeals as required to begin processing petitioners' offer in compromise and that she would check to see what had to be done to release it. Watson called Wilkes later that day and said that she had been unable to identify who to contact to release petitioners' case from Appeals.

Petitioner called Wilkes on June 18, 2002, and asked what her office could do for petitioners. Wilkes told petitioner she could monitor the processing of petitioners' offer in compromise, which normally takes 6 to 12 months. Wilkes also told petitioner that only respondent's collections office could release the tax lien. Wilkes told petitioner that he had 2 weeks to send letters to her from his creditors stating that they would not do business with him because of the tax lien.

On June 20, 2002, petitioner faxed to Wilkes a letter from a creditor stating that, because of the lien, petitioner's purchases had to be cash on delivery. Wilkes told petitioner that the letter was not enough to justify releasing the lien. On

June 25, 2002, petitioner faxed three more letters to Wilkes from third parties stating that the lien and petitioner's credit reports showing the lien had caused them to eliminate or limit their line of credit to petitioner's business.

On July 1, 2002, respondent's Brookhaven Service Center in Holtsville, New York, received a note from petitioner marked "URGENT" stating that the tax lien was causing him to lose business. Petitioner attached the three letters he had provided to Wilkes from third parties. Around that time, petitioner lost the Godfather Pizza account (17 stores), which was his largest account. On July 1, 2002, respondent's Brookhaven Service Center received an offer in compromise from petitioners in which they proposed to settle their 1991-95 tax liability for $900.

On July 2, 2002, petitioners filed their income tax returns for 2000 and 2001 with the Taxpayer Advocate Service office. In them, petitioners reported net losses for petitioner's business of $15,180 for 2000 and $18,064 for 2001 and net income from renting equipment of $44,727 for 2000 and $50,699 for 2001.

Petitioner told Wilkes on July 2, 2002, that he had called the offer in compromise unit daily and had spoken with Laura Greco (Greco). Wilkes told petitioner that she could not intervene in the offer in compromise process, but that she would call Greco.

On July 3, 2002, Wilkes called Greco. Greco told her that she could not work on petitioners' offer in compromise because petitioners' account had a collection due process code on it and the code to release it was not present in their account. Wilkes tried to find which Internal Revenue Service (IRS) office could provide the collection due process release code for petitioners' account. She told petitioner on July 5, 2002, that she was trying to correct the codes entered into petitioners' account so that respondent could process petitioners' offer in compromise.

Wilkes discussed petitioners' case with her group manager on July 8, 2002, and prepared a letter to petitioners stating that the lien was not causing a hardship to petitioners because the lien was not preventing petitioner from doing business. The group manager said that she could enter the appropriate code in respondent's computer system to release petitioners' case so that petitioners' offer in compromise could be considered if Wilkes would fax her the collection due process "closing letter" (not otherwise described in the record). Wilkes could not find the closing letter in the file. Wilkes called Watson, and Watson faxed a copy of the closing letter to Wilkes on July 9, 2002. Wilkes then faxed the letter to the group manager on July 9, 2002.

On July 23, 2002, Wilkes wrote petitioners and said (a) respondent would not release the Federal tax lien and that it

would remain in effect until petitioners' taxes were paid in full, their liability was satisfied through an offer in compromise, or the statute of limitations prevented collection; (b) she had transferred petitioners' offer in compromise to the Jacksonville office for processing; and (c) she was closing her file on petitioners.

On September 5, 2002, Watson gave petitioners written payoff figures for their taxes dues for 1991-95 if paid by September 16, 2002. On September 24, 2002, Watson gave petitioners written payoff figures for their taxes due for their taxes due for 1991-95 if paid by September 30, 2002.

4. Payment of Tax and Interest

Petitioners borrowed money using their residence as collateral and, on October 8, 2002, paid their taxes due in full as follows: $2,780.56 for 1991, $3,455.85 for 1992, $2,417.09 for 1993, $3,946.01 for 1994, and $991.77 for 1995. Petitioners paid interest of $1,320.14 for 1991, $1,323.04 for 1992, $868.18 for 1993, $1,296.73 for 1994, and $288.69 for 1995.

Petitioners sent Wilkes a letter on October 9, 2002, and enclosed a copy of a Form 843, Claim for Refund and Request for Abatement, in which they requested abatement of interest that had accrued for their 1991-95 tax years.

On March 21, 2003, respondent abated the additions to tax for failure to timely file under section 6651(a)(1) and for

failure to pay tax shown on the return under section 6651(a)(2) for 1991-95, and abated interest on these additions to tax.

On March 28, 2003, petitioner telephoned the Taxpayer Advocate Service office and spoke with Christy Elliott (Elliott). Petitioner also wrote to Elliott on that date to confirm that he told her that he had submitted Form 843 on October 9, 2002.

On March 31, 2003, respondent refunded the overpayments resulting from the abatement of additions to tax and related interest on March 21, 2003.

On April 16, 2003, respondent returned petitioners' Form 843 because petitioners had not indicated why respondent should abate interest for petitioners. On April 21, 2003, petitioner sent Elliott copies of some of petitioners' correspondence to and from respondent.

On May 13, 2003, Diane Elm (Elm), accounts management, respondent's Ogden, Utah, Service Center, wrote to tell petitioners that the Service Center had not completed the processing necessary to resolve petitioners' case. Elm said that the IRS would contact petitioners within 60 days.

OPINION

A. Contentions of the Parties and Background

Petitioners contend that interest should be abated from March 18, 1999 (when petitioners sent a letter to Davis stating that their returns were wrong), through October 8, 2002, (when

petitioners fully paid their taxes and interest for 1991-95) because respondent's employees had: (1) Erroneously advised petitioners to seek relief through an offer in compromise; and (2) delayed working on petitioners' case because they lost petitioners' files, took maternity leave, regular leave, and job-related training and delayed it to work on other cases. Respondent contends that respondent's denial of petitioners' request to abate interest was not an abuse of discretion.

The Commissioner may abate interest assessed on any deficiency or payment of tax to the extent that any error or delay in payment of the tax is attributable to erroneous or dilatory performance of a ministerial act by an officer or employee of the Commissioner, and the taxpayer caused no significant aspect of the delay. Sec. 6404(e)(1).[4] A

---

[4] Sec. 6404(e)(1), as enacted in 1986 and as applicable here, provides:

> SEC. 6404(e). Assessments of Interest Attributable to Errors and Delays by Internal Revenue Service.--
>
> > (1) In general.--In the case of any assessment of interest on--
> >
> > > (A) any deficiency attributable in whole or in part to any error or delay by an officer or employee of the Internal Revenue Service (acting in his official capacity) in performing a ministerial act, or

(continued...)

ministerial act is a procedural or mechanical act that does not involve the exercise of judgment or discretion by the Commissioner.  Sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987).

We apply an abuse of discretion standard in reviewing the Commissioner's determination not to abate interest.  Lee v. Commissioner, 113 T.C. 145, 149 (1999); Krugman v. Commissioner, 112 T.C. 230, 239 (1999).  To be eligible for relief under section 6404(e), the taxpayer must establish a correlation between the alleged error or delay by the Commissioner and a

---

[4](...continued)
                    (B) any payment of any tax
              described in section 6212(a) to the
              extent that any delay in such
              payment is attributable to such
              officer or employee being dilatory
              in performing a ministerial act,

              the Secretary may abate the assessment of all
              or any part of such interest for any period.
              For purposes of the preceding sentence, an
              error or delay shall be taken into account
              only if no significant aspect of such error
              or delay can be attributed to the taxpayer
              involved, and after the Internal Revenue
              Service has contacted the taxpayer in writing
              with respect to such deficiency or payment.

In 1996, Congress amended sec. 6404(e) to permit abatement of interest that accrues as a result of an "unreasonable" error or delay in performing a ministerial or "managerial" act.  Sec. 6404(e)(1)(A) and (B); Taxpayer Bill of Rights 2 (TBOR 2), Pub.L. 104-168, sec. 301(a), 110 Stat. 1457 (1996).  The 1996 amendment applies to deficiencies or payments for tax years beginning after July 30, 1996, TBOR 2 sec. 301(c), 110 Stat 1457, and thus does not apply here.

specific period for which interest should be abated as a result of that error or delay. Palihnich v. Commissioner, T.C. Memo. 2003-297; Donovan v. Commissioner, T.C. Memo. 2000-220; Douponce v. Commissioner, T.C. Memo 1999-398.

B.  March 18, 1999, to June 25, 2001

    1.  Alleged Erroneous Advice by Davis

Petitioners contend that Davis erred in recommending that they file an offer in compromise and that she should have instead recommended that they address issues concerning telecommunication expenses when petitioner told her on March 18, 1999, that they did not include all telecommunication expenses in their original returns for 1991-95. We disagree that this is an appropriate basis to consider relief for petitioners because Davis's advice (the merit of which we need not consider) requires judgment and thus was not ministerial. Sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., supra.

    2.  Maternity Leave

Petitioners contend that respondent delayed working on their case during an unspecified period between March 18, 1999, and June 25, 2001, because Davis was on maternity leave. We disagree that this is an appropriate basis to consider relief for petitioners. Granting maternity leave to an employee of the Commissioner assigned to the taxpayer's case without reassigning the case is not a ministerial act under section 6404(e)(1). Sec.

301.6404-2T(b)(1) and (2), Example (4), Temporary Proced. &
Admin. Regs., supra.

### 3. Job-Related Training

Petitioners point out that Watson attended job-related
training from April 30 to May 11, 2001, and contend that this
delay is due to a ministerial act.  We disagree.

The decision to send Watson to job-related training and to
not reassign the case is not a ministerial act under section
6404(e)(1).  Durham v. Commissioner, T.C. Memo. 2004-125; Goettee
v. Commissioner, T.C. Memo. 2003-43; Jean v. Commissioner, T.C.
Memo. 2002-256; Camerato v. Commissioner, T.C. Memo. 2002-28;
Jacobs v. Commissioner, T.C. Memo. 2000-123; sec.
301.6404-2T(b)(2), Example (4), Temporary Proced. & Admin. Regs.,
supra.

## C. June 26 to November 7, 2001

Respondent lost petitioners' file from June 26 to November
7, 2001.  The Commissioner's loss of a taxpayer's file is a
ministerial act.  Palihnich v. Commissioner, supra.  Respondent
concedes that interest that accrued during this period should be
abated.

Petitioners contend that respondent lost petitioners' files
many other times.  However, petitioners have not identified those
times, and the record does not support that conclusion.

D.    November 8, 2001, to January 23, 2002

Watson did not work on petitioners' case during unspecified periods between November 8, 2001, and to January 17, 2002, because she was working on other cases and she took annual leave. Petitioners contend that Watson's caseload and her annual leave were ministerial acts which caused a delay in working on petitioners' case.

Deciding how and when to work on cases, on the basis of an evaluation of the entire caseload and workload priorities, is not a ministerial act.  Bartelma v. Commissioner, T.C. Memo. 2005-64; Mekulsia v. Commissioner, T.C. Memo. 2003-138, affd. 389 F.3d 601 (6th Cir. 2004).  Granting annual leave is not a ministerial act. See Scott v. Commissioner, T.C. Memo. 2000-369.  There is no evidence that a ministerial act delayed respondent's consideration of petitioners' case from November 9, 2001, to January 23, 2002.

E.    January 24 to July 23, 2002

We next decide whether respondent's failure to enter the code to release petitioners' file from CDP status from January 24 to July 23, 2002, was a ministerial act for which they are entitled to relief under section 6404(e).  The code releasing petitioners' case from CDP status should have been entered on January 24, 2002, when Watson closed their CDP file.  The record is silent as to when the code was entered.  On July 23, 2002,

Wilkes wrote petitioners and said she had transferred petitioners' offer in compromise to the Jacksonville office for processing. We infer that the CDP release code was entered on July 23, 2002, because respondent was able to work on petitioners' case on that date. Everything in the record relating to entering the CDP release code in petitioners' file suggests that the delay in doing so was a ministerial act, sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., supra, and that the delay was an error, see Palihnich v. Commissioner, T.C. Memo. 2003-297 (failure to pay tax attributed to the Commissioner's loss of file); Jacobs v. Commissioner, T.C. Memo. 2000-123 (lack of evidence held against the Commissioner because the Commissioner is in the best position to know what actions were taken by IRS officers and employees during the period for which the taxpayers' abatement request was made); Douponce v. Commissioner, supra (failure to pay tax attributed to the Commissioner's failure to provide correct payoff amount).

However, petitioners are not entitled to relief under section 6404(e) from January 24 to July 2, 2002, because they did not file their tax returns for 2000 and 2001, as required by respondent before considering their offer in compromise, until July 2, 2002. Thus, a significant aspect of respondent's delay was due to petitioners.

We consider next whether respondent's failure to enter the proper code from July 3 to July 23, 2002, delayed petitioners' payment of tax. Petitioners fully paid their taxes and interest for 1991-95 when respondent finished working on their case. We believe that they would have fully paid earlier if respondent had acted more promptly, and that failure to enter the proper code delayed petitioners' payment of tax.

The decision whether to abate interest may take into account an error or delay only where no significant aspect can be attributed to the taxpayer. Sec. 6404(e)(1) (flush language). Petitioners had no role in respondent's failure to enter the proper CDP release code.

We conclude that respondent's failure to abate interest from July 3 to July 23, 2002, was an abuse of discretion.

F.   July 24 to October 8, 2002

Petitioners fully paid the taxes and interest due for 1991-95 on October 8, 2002. On a date not specified in the record between July 24 and October 8, 2002, petitioners decided to borrow money to fully pay their 1991-95 taxes and interest. Watson gave petitioners payoff figures for those years in early and late September 2002. We conclude that no ministerial act by respondent caused petitioners to delay paying their taxes from July 24 to October 8, 2002.

G.   Conclusion

Respondent's decision not to abate interest for the period from July 3 to July 23, 2002, was an abuse of discretion. Respondent's decision not to abate interest for any remaining period, not previously conceded, was not an abuse of discretion.

To reflect the foregoing,

Decision will be
entered under Rule 155.